# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0280
Filed July 22, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Curtis Lloyd,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable Linda M. Fangman, Judge.

———————————

**AFFIRMED**

———————————

Martha J. Lucey, State Appellate Defender, and Ella M. Newell, Assistant
Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney
General, attorneys for appellee.

———————————

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Buller, J.

**BULLER, Judge.**

Curtis Lloyd appeals his enhanced convictions for two counts of third-degree sexual abuse following a trial by jury. He claims the district court should have granted a continuance he requested the morning of trial and his requests to represent himself mid-trial and at sentencing. He also challenges the sufficiency of the evidence with regard to one count of sex abuse and asserts an abuse of discretion at sentencing. After careful review of the record, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

In May 2018, two fifteen-year-old girls—A.N. and J.W.—contacted thirty-one-year-old Lloyd through a messaging app and then met up with him and four other adult men. The men gave the girls alcohol and drove them around before eventually taking them to the Econo Lodge hotel in downtown Waterloo. Lloyd rented the group a single room, where they drank and smoked marijuana.

Some of the men—including Lloyd—started touching J.W. inappropriately; she got upset and threw a lamp. In her words, Lloyd started "[p]utting his hands on me, touching me on my body, butt, trying to get me in the mood." He tried to pull her pants down and touched his penis against her back. She recalled that his hand touched her vaginal area but did not penetrate her. She resisted so forcibly her belt loop ripped. The girls told the men they wanted to go home, but the men told them "no," and that they were "going to stay." In A.N.'s words, things "escalated" with "more rowdiness, more, like, yelling."

The girls eventually convinced the men to get back in the vehicle, and the men dropped them off "on a random street." But it was cold, the girls

didn't know where they were, and they couldn't figure out how to get home. The girls eventually called the group of men back, and the men came back to collect them. Soon the men started touching J.W. again, and eventually "threw her out [of] the car." A.N. tried to go with J.W., but one of the men punched her in the eye and wouldn't let her get out; they drove off. One of the men announced "we didn't get this hotel for no reason," and they took A.N. back to the Econo Lodge.

A.N. eventually passed out back in the hotel room. She woke up naked, with Lloyd naked and touching her mouth and vagina with his penis. A.N. recalled that Lloyd's penis was erect, and he raped her vaginally. So did the other men. She said "stop" and yelled, "I want to go home." She tried to fight, but she couldn't escape. She eventually stopped fighting. In total, she thought the gangrape[1] lasted "fifteen, twenty minutes." Lloyd ejaculated on her chest and her face. She eventually made her way to another hotel and was able to call for help.

J.W. made it home after being thrown out of the vehicle, but she did not immediately tell anyone what happened at the hotel. When asked why she didn't tell her mom, she explained: "I felt ashamed, just disgusted of myself. I felt like I put myself in a situation, and I didn't want her to know about it."

---

[1] In its brief, the State observes this was a "classic example of a gang rape." *Cf. State v. Brimmer*, 983 N.W.2d 247, 258–59 (Iowa 2022) (observing an abettor to one rape can encourage and embolden another perpetrator to act). We agree. And although this was charged on the age alternative rather than the gang-rape alternative in section 709.3, we think "gangrape" is the only single word that adequately describes this multiple-offender sex crime without overly sanitizing our description of the acts.

Both girls were eventually seen by sexual assault nurse examiners (SANEs). A.N. described the gangrape in some detail as part of the medical examination:

> The guys were all over me, taking my clothes off, doing stuff to me. One of the guys came over and put it in my vagina, and other guys were having me open my mouth and being aggressive. . . . They kept taking turns. They would go in, and the others would go out of my vagina.

She described how the men took them for a drive after the hotel, then said "you bitches about to get dropped off," before throwing J.W. out of the vehicle. She said they "kept grabbing" her, took her back to the hotel, and raped her again. The SANE observed bruising consistent with A.N.'s report of being punched in the face, as well as various bruises and abrasions to her body, and redness and a white substance during the vaginal exam. J.W. told a different SANE that multiple men were "touching my crotch and everywhere. They got my clothes off eventually, and I was snapping." She specifically identified Lloyd as one of the assailants. And the SANE documented injuries consistent with being thrown from or dragged by a vehicle.

One of Lloyd's co-defendants testified for the State at trial. He had pled guilty to raping J.W. and admitted at trial to performing sex acts on A.N. He also told police that he and Lloyd had sex with J.W. on one bed: "Lloyd was having sex with [J.W.] doggy-style while [the co-defendant] was receiving oral sex from her." At trial, the co-defendant essentially denied seeing Lloyd have sex with either of the girls. The trial record discloses that, despite clearly posted signs telling him to wait in the hallway, the co-defendant watched all or nearly all of J.W.'s testimony. No party sought a mistrial. But the court admonished the co-defendant, "I'm certainly going to

suggest that you've tailored your testimony to what [J.W.] testified to," and described his conduct as "contemptuous."

A Division of Criminal Investigation DNA analyst testified to various samples collected from Lloyd, the two girls, and Lloyd's underwear. Swabs collected from both girls' vaginas showed multiple DNA contributors and sperm cells. The sample from A.N.'s vagina had at least three individual contributors, which made it impossible to link the sperm to a single person. Swabs of her face showed seminal fluid and at least two individual contributors, and swabs of her neck showed at least four contributors. Swabs of J.W.'s labia majora and vagina also had seminal fluid from at least two individuals, rendering individual identification impossible. A swab of J.W.'s anus also had a mixture of at least two contributors who could not be individually identified. A swab of Lloyd's penis found at least two DNA profiles, not individually identifiable; a swab of the underwear he was wearing that night had DNA from at least four individuals.

Surveillance footage obtained by police confirmed the girls and group of men were seen at the Econo Lodge and that the group left and returned with A.N. but without J.W. Police confirmed Lloyd rented the room in his name.

Police interviewed Lloyd three times—twice in the days after the assault and again about eight months later:

- During the first interview on May 13—later that day—Lloyd told officers he knew police were questioning him about the two girls his group met up with, but he said he didn't know any of the men's names. He admitted that he "messed" with J.W., but that she said she was eighteen. He said he thought the girls were on "pills" from

5

"the Dollar Store." And he described J.W. "going crazy" at the hotel room before they took her home. After some back and forth and evasion, he told police he saw "probably two or three" of the men having sex with A.N. while he was in the room, "probably one at a time," and "probably . . . doggy-style." He described the sex as consensual.

- During the second interview on May 14, Lloyd said he was "trying" to have sex with J.W., but she didn't want to. He denied any contact with her beyond her "laying on top of" him. And he reiterated that he saw another of the men having sex with A.N.

- During a third interview in February 2019, police told Lloyd his statements about whether he had sexual contact with the girls differed from what the victims and his co-defendants said. Lloyd said again he did not have any sexual contact with or kiss either of the girls. He said he "was going to" have sex with J.W. before she "snapped," and he took off his pants and boxer shorts but not his shirt. He said he thought J.W. had her "panties" on but he didn't remember for sure.

Lloyd testified at trial. He described how he and his compatriots were just "chilling" with A.N. and J.W., then A.N. "ended up . . . having sex" with one of the men in front of the group. He said he did not touch J.W., but she was "hugging on" him. And he claimed J.W. did not get mad because he was touching her; he said instead she was mad because she wanted to have sex and he couldn't because his "penis wasn't even hard . . . [s]o she just threw a tantrum." When asked on cross-examination how many people had sex with A.N. that night, he said "at least one" of them had sexual contact with her. He also said that he tried to help police investigate the events at the Econo

Lodge, rounding up his compatriots and delivering them to police, because he wanted to "clear they name."

The jury found Lloyd guilty as charged, and Lloyd stipulated to his prior offenses for purpose of the habitual-offender enhancement. The court sentenced him to consecutive sentences with the enhancement on each. Lloyd appeals.

## DISCUSSION

Lloyd challenges denial of a morning-of-trial motion to continue, claims he sought to represent himself at trial and sentencing, contests sufficiency of the evidence he sexually abused J.W., and asserts the district court abused its discretion at sentencing. We consider each separately, given the differing standards of review.

### I.    Motion to Continue

On the morning of trial, just before jury selection began, Lloyd's attorney moved for a continuance, with the stated reason that he wished to conduct depositions. But, both in writing and in an earlier hearing, Lloyd had vociferously demanded speedy trial. The court denied the motion for continuance, explaining that—due to unrelated scheduling issues—the trial was not happening on Thursday, Friday, and Monday,[2] which meant those days were available for depositions. The court also observed those days were all before the victims were expected to testify, and that Zoom was an option if there were logistical issues.

---

[2] The judge was unavailable due a judicial conference, and the trial was apparently scheduled despite her conflict to accommodate Lloyd's speedy-trial demand. Jury selection took all day Tuesday, and Wednesday was also a partial court day.

We review denial of a continuance for an abuse of discretion. *State v. Artzer*, 609 N.W.2d 526, 529 (Iowa 2000). Lloyd argues the court abused its discretion, despite his speedy-trial demand. He makes a conclusory argument that he was prejudiced, citing only his "belie[f] his counsel was unable to adequately prepare for trial and it undermined his confidence in his attorney." On this record, we discern no abuse of discretion. To the extent Lloyd's concern about depositions was voiced in good faith, he had three workdays to conduct depositions mid-trial. When defense counsel reported he was unable to obtain the services of a court reporter for the depositions within the given time, Lloyd refused to waive speedy trial to get the depositions scheduled. As the district court aptly observed, "sometimes people have to choose . . . between doing thorough discovery and . . . having their speedy trial." We discern no abuse of discretion in the district court respecting Lloyd's demand for speedy trial rather than his lawyer's demand for a continuance.

In his reply brief, Lloyd cites outside-the-record news articles making broad assertions about the *official* court-reporter shortage. We find these outside-the-record materials are not properly included in the briefing. *See* Iowa R. App. P. 6.801. But even if we did consider the outside-the-record news articles, they have nothing to say about *private* court reporters—and that is who actually reports discovery depositions in criminal cases. To the extent Lloyd's argument does not violate the rules of appellate procedure, it is meritless because it does not align with how depositions actually work.

## II. Self-Representation Claims

Lloyd challenges two separate occasions on which he claims he sought to represent himself, though a careful reading of the record demonstrates he was instead complaining about his attorney. We consider each.

## A. Mid-Trial

On the third day of trial, Lloyd's attorney moved to withdraw at Lloyd's request, indicating in a two-sentence oral motion that Lloyd was willing to "move forward pro se if it's an issue with the trial moving forward today." The court sought clarification from Lloyd on what he was asking for, through this exchange:

> COURT: Okay. All right. And before we bring the jury in, obviously I heard from [defense counsel]. I probably should hear from Mr. Lloyd.
>
> Mr. Lloyd, what is it you want to tell me as to why you think you need new counsel?
>
> DEFENDANT: I feel like with regard—I feel like I ain't being represented the right way. You know, I ain't did nothing in this trial. I haven't depositioned nobody. I was supposed to deposition somebody Monday. That never happened. I haven't depositioned nobody. I wanted to deposition them. I let my lawyer—I let him know that I wanted to deposition these people. I haven't depositioned nobody. We had since—since you left since Tuesday to do it, and it never happened.
>
> COURT: Okay. [defense counsel] or [assistant county attorney], regarding his request for a depo? I did see you . . . filed a notice that you wanted to take depos.
>
> DEFENSE COUNSEL: Yeah. I attempted to set it up. I was unable to get a court reporter. So with the time limit—and I discussed this with Mr. Lloyd. I asked him to waive speedy so we have more time to actually get that kind of stuff done, that this isn't a McDonald's cheeseburger robbery. You need to put time into this to be able to get that type of stuff done. He didn't want to do it. So I did the best I could with the time given, and it wasn't able to get scheduled.
>
> COURT: Mr. Lloyd, obviously you did demand speedy. There is a time crunch.
>
> DEFENDANT: Yes, I demanded speedy. But still like—like, I still ain't depositioned nobody.

COURT: Okay. Well, I mean, frankly, sometimes people have to choose. They have to choose between doing thorough discovery and . . . having their speedy trial. You demanded a speedy trial. We are here in the middle of speedy trial. Frankly, we're so far early [defense counsel] hasn't really been given an opportunity to do anything yet.

DEFENDANT: Exactly.

COURT: But I am familiar with [defense counsel]. I have tried cases with [defense counsel], and he is a qualified and diligent attorney. So I have no reason based on this record to believe that there's any reason to remove [defense counsel]. And frankly, my concern would be that this would be some sort of tactic to a delay or cause a problem.

We certainly cannot have a new attorney step in today. That new attorney would have no idea what's going on. So [defense counsel] is clearly leaps and bounds above a new attorney who would step in today. That's impossible. That being said, if [defense counsel] tells me he's ready to go, I have faith and confidence that he is prepared.

Is there something else that you want to tell me?

DEFENDANT: I just said what—I just said what I wanted. I mean, evidently y'all—I mean, y'all gonna have it y'all way, so it is what it is.

COURT: Well, we're going to have it the way we follow the rules and the law, yes.

In his appellate brief, Lloyd admits there was no legal basis to grant his motion for a new attorney based on this record. But he argues the district court had a duty to notify him that he had the choice to proceed with his current attorney or represent himself. The State responds that Lloyd did not preserve error because he did not ask to represent himself. We review de novo. *State v. Rater*, 568 N.W.2d 655, 657 (Iowa 1997).

As a factual matter, the exchange detailed above does not include a request by Lloyd to represent himself; it's all complaints about his attorney and general frustration with the trial process. A request to represent oneself

must be "clear and unequivocal." *Id.* at 658. Lloyd's statements don't meet that threshold. Our own published and unpublished decisions recognize that even an explicit reference to self-representation is not an unequivocal request if it comes in the context of complaints about counsel specifically or the trial process generally. *See State v. Spencer*, 519 N.W.2d 357, 359–60 (Iowa 1994) (en banc); *Reese v. State*, 391 N.W.2d 719, 724 (Iowa Ct. App. 1986); *State v. Young*, No. 14–0271, 2015 WL 1055070, at *4 (Iowa Ct. App. Mar. 11, 2015). And, contrary to Lloyd's suggestion on appeal, when a criminal defendant expresses such dissatisfaction, the court is under no obligation to inquire whether a defendant wishes to represent himself. *State v. Smith*, 215 N.W.2d 225, 227 (Iowa 1974). We conclude Lloyd did not invoke his right to self-representation at trial.

But even if he had, the right to self-representation is "curtailed after commencement of trial." *Id.* at 227. Our supreme court has even said it is "highly questionable" whether there is such a right after trial begins. *Id.* We also observe the court's comments about Lloyd potentially using the request as a delaying tactic are generally supported by his obstreperous conduct throughout the record. And, although they were stated frankly, we cannot disagree with the substance of the trial court's comments that Lloyd had made his choice between more time for preparation and demanding speedy trial, and now he had to live with the consequences. We discern no error or abuse of discretion on this record.

## B. Start of Sentencing

Lloyd next asserts that comments he made at the start of the sentencing hearing were another request for self-representation. The record on this issue is somewhat convoluted: the hearing was apparently set as a combined sentencing for a gun charge to which Lloyd pled guilty and the

sex-abuse charges at issue in this appeal. At defense counsel's request, the parties "start[ed] with the gun case," which prompted Lloyd to repeatedly interject, claiming he had not pled guilty. (In reality, he pled guilty orally on the record.) To the extent Lloyd made any self-representation request, it pertained only to his attempt to invalidate his plea to the gun charge, and our review of the transcript does not reveal any request to proceed unrepresented at sentencing for the sex-abuse charges. This understanding is confirmed by our review of the pleadings in this case number, which includes two of Lloyd's pro se motions seeking to remove counsel without mention of self-representation. And it's confirmed by Lloyd's statements later in the sentencing hearing, where he did not ask to proceed pro se but did complain he was "not being represented right" and "would like somebody else, another counsel to be representing me." Like his trial comments, these were again generalized complaints seeking a new lawyer—not requests to proceed unrepresented.

Applying the same principles we discussed above, we do not discern any unequivocal request for self-representation as pertains to the sex-abuse charges. *Rater*, 568 N.W.2d at 658. Generalized complaints about counsel do not rise to that level. *Smith*, 215 N.W.2d at 227. And even if they did, we would find no abuse of discretion in the district court denying such a motion at the start of sentencing, given Lloyd's track record of delays, outbursts, and general impediment to the orderly administration of justice in the courtroom. *See id.; cf. State v. Ellis*, No. 23–1852, 2025 WL 855642, at *8 (Iowa Ct. App. Mar. 19, 2025) (collecting cases affirming discretion to deny eleventh-hour motions for new counsel).

Finally, we observe that, in Lloyd's reply brief on this issue, he cites an order filed in the gun-charge case that is not part of the record in this appeal.

Iowa R. App. P. 6.801; *Peterzalek v. Iowa Dist. Ct.*, 7 N.W.3d 37, 41 (Iowa 2024) ("Generally speaking, our review is limited to the record made in 'the district court case from which the appeal is taken.'" (citation omitted)). The knowing insertion of outside-the-record material into appellate briefing is a recurring problem in the digital era of online dockets. *See, e.g.*, *State v. Hammond*, No. 25-0432, 2026 WL 892561, at *3 (Iowa Ct. App. Apr. 1, 2026); *Cornell v. State*, No. 24-1501, 2026 WL 892372, at *3 (Iowa Ct. App. Apr. 1, 2026); *Hatchett v. State*, No. 24-1926, 2026 WL 685457, at *1–2 (Iowa Ct. App. Mar. 11, 2026); *State v. Spooner*, No. 24-0249, 2026 WL 42563, at *3–4 (Iowa Ct. App. Jan. 7, 2026); *Flores v. Nunez*, No. 24-1037, 2025 WL 3654122, at *1 (Iowa Ct. App. Dec. 17, 2025); *Gordon v. State*, No. 23-1134, 2025 WL 2057754, at *1 n.1 (Iowa Ct. App. July 23, 2025). On our own motion, we strike the outside-the-record information from Lloyd's reply brief, and we instruct counsel to not cite outside-the-record material in the future.

### III.    Sufficiency of the Evidence

Lloyd challenges sufficiency of the sex-abuse count related to J.W., and he concedes every element except that he performed a sex act on her. As marshaled, Lloyd could have been found guilty as a principal or aider-and-abettor for one of the co-defendants' acts. We review for correction of errors at law, viewing the evidence in the light most favorable to the State. *State v. Hernandez*, 20 N.W.3d 502, 507 (Iowa Ct. App. 2025) (en banc). We find both theories of liability supported by substantial evidence.

As to principal liability, J.W. testified that Lloyd touched her vagina with his hands but did not "get in" her. This was consistent with her contemporaneous statements to the SANE, in which she identified Lloyd as one of the assailants and said her "crotch and everywhere" were touched by

the men. Lloyd's co-defendant also told police that he saw Lloyd "having sex with [J.W.] doggy-style." Either or both of these sex acts, if found by the jury, were sufficient to support conviction as a principal. And to the extent the co-defendant's statement required corroboration, it was abundant: through the testimony of the girls, the DNA evidence, and even Lloyd's own admissions. Iowa R. Crim. P. 2.21(3).

As to aiding and abetting, there is significant evidence Lloyd aided and abetted others, including the co-defendant who testified at trial, having sex with J.W. To prove Lloyd aided and abetted, the State had to prove he "assented to or lent countenance and approval to the criminal act either by active participation in it or by some manner encouraging it prior to or at the time of its commission." *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (citation omitted). By all accounts in the record, it was Lloyd who was the link between these underage girls and his cadre of adult men. The most prominent evidence that Lloyd facilitated the gangrape is that he was the communication link to the girls and rented the hotel room. The co-defendant's description of Lloyd penetrating J.W. "doggy-style" necessarily aided and abetted the co-defendant receiving oral sex, if that testimony was believed by the jury. The multiple DNA profiles found in J.W.'s vagina also circumstantially prove multiple men raped her vaginally, with Lloyd's participation or encouragement. And the mixture of four persons' DNA on Lloyd's underwear adds a layer of circumstantial corroboration. Substantial evidence demonstrates the defendant at minimum encouraged or arranged the crime.

We last address an argument made in Lloyd's reply brief, which spends multiple pages emphasizing that no DNA contributors could be positively identified in the swabs taken as part of the sexual assault kits from the girls,

the swab of Lloyd's penis, or his underwear. This is a factual problem inherent in gangrapes, and it is a product of the criminal conduct. That a criminal offender chooses to participate in a gangrape, precluding a high-probability DNA match as compared to a single-offender rape, does not warrant a special rule. We discern no basis for relief on this argument.

## IV.    Sentencing

Lloyd's final contention is that the sentencing court improperly considered that he committed these new offenses while he was on parole for other offenses. He focuses on this portion of the transcript, in which the bracketed sentence is original and reflects one of the numerous occasions on which Lloyd attempted to disrupt the proceedings:

> [COURT:] Also, in light of the fact that you were on parole when you committed these two new felonies, these counts will run consecutive to your parole. Regardless of what your belief was in the other case—

> [Defendant continued talking while the Court pronounced sentence.]

> COURT: —you knew you were on parole, and then you absconded from parole. I'm going to guess as part of parole, you weren't supposed to be hanging around with these girls. You probably weren't supposed to be hanging around with these friends. You probably weren't supposed to be drinking or doing drugs. So for all of those reasons, these two run consecutive to the parole.

Lloyd contends this passage reflects the sentencing court making findings about his exact conditions of parole, even though those conditions were not formally made part of the record. We review for an abuse of discretion. *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002).

We do not read the sentencing transcript the same way Lloyd does. The court's observations, as we understand them, were all fair comment on

Lloyd's failure to rehabilitate. He was on parole, meaning he was under some degree of structured supervision, and he nonetheless was drinking, smoking marijuana, partying with underage girls, and committing the sexual assaults that led to his felony convictions in this case. By any measure, this is evidence that the criminal justice system's past efforts to rehabilitate Lloyd were less than successful. And the General Assembly has expressly codified a statutory presumption that the commission of new felonies while on parole warrants consecutive sentences. Iowa Code § 908.10(2) (2024). We discern no abuse of discretion or improper consideration.

**AFFIRMED.**